IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| RUBY STIGALL,<br>　　Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 3:14cv666 (JRS) |
| | ) | |
| CAROLYN W. COLVIN<br>Acting Commissioner of Social Security,<br>　　Defendant. | ) | |

REPORT AND RECOMMENDATION

Ruby Stigall ("Plaintiff") is forty-four years old and previously worked as a certified

nursing assistant, a janitor and a panel-maker. On March 23, 2011, Plaintiff applied for

Supplemental Security Income ("SSI") under the Social Security Act ("Act"), alleging disability

since February 25, 2011,[1] due to back problems, pinched nerve, high blood pressure, diabetes,

asthma, arthritis, rheumatoid arthritis, osteoarthritis, carpal tunnel syndrome, gastro esophageal

reflux disease, dyspnea, neuropathy, scolosis disease, chronic venous insufficiency,

chrondromalacia of the right knee and trouble walking, sitting, seeing and remembering things.

Plaintiff's claim was denied both initially and upon reconsideration. On March 28, 2013,

Plaintiff (represented by counsel) appeared by video before an Administrative Law Judge

("ALJ") for an administrative hearing. The ALJ subsequently denied Plaintiff's claims in a

written decision dated April 18, 2013. On June 14, 2013, the Appeals Council denied Plaintiff's

---

[1]　Plaintiff previously applied for Disability Insurance Benefits ("DIB") and SSI on May 9, 2002, alleging disability beginning June 1, 2001. (R. at 67.) An ALJ issued a final decision denying this claim on March 26, 2004. (R. at 67-75.) Plaintiff subsequently applied for SSI on May 16, 2009, alleging disability beginning January 1, 2006. (R. at 81.) Another ALJ issued a final decision denying this claim on February 25, 2011. (R. at 81-89.)

request for review, rendering the ALJ's decision the final decision of the Commissioner of Social Security ("Commissioner").

Plaintiff now appeals the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in determining that Plaintiff's peripheral neuropathy was a non-severe impairment, in determining that Plaintiff maintained the ability to perform limited light work, in formulating the hypothetical to the vocational expert ("VE") and in assessing Dr. Avery's and Dr. Villar-Gosalez's opinions. (Pl.'s Mem. in Supp. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 13) at 16-20.) Defendant responds that the ALJ did not err and that substantial evidence supports the ALJ's decision. (Def.'s Mot. for Summ. J. and Br. in Supp. Thereof ("Def.'s Mem.") (ECF No. 16) at 12.)

This matter comes before the Court for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) on the parties' cross-motions for summary judgment, which are now ripe for review. Having reviewed the parties' submissions and the entire record in this case,[2] for the reasons set forth below, the Court recommends that Plaintiff's Motions for Summary Judgment or in the Alternative Motion for Remand (ECF Nos. 13, 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

## I.    BACKGROUND

Because Plaintiff challenges the ALJ's decision, Plaintiff's education and work history, medical record, function report, testimony and VE testimony are summarized below.

---

[2]    The administrative record in this case has been filed under seal, pursuant to E.D. Va. Loc. R. 5 and 7(C). In accordance with these Rules, the Court will endeavor to exclude any personal identifiers such as Plaintiff's social security number, the names of any minor children, dates of birth (except for year of birth), and any financial account numbers from its consideration of Plaintiff's arguments and will further restrict its discussion of Plaintiff's medical information to only the extent necessary to property analyze the case.

A. Education and Work History

Plaintiff was forty years old when she applied for SSI. (R. at 35.) Plaintiff completed high school and training as a certified nursing assistant. (R. at 245.) Plaintiff previously worked as a certified nursing assistant, janitor and panel-maker. (R. at 246.)

B. Medical Records

On September 22, 2008, Plaintiff saw Christian D. Schunn, M.D. of Surgical Associates of Richmond, complaining of burning calf pain. (R. at 492.) Dr. Schunn assessed that Plaintiff suffered from mild chronic venous insufficiency, significant obesity and diabetes. (R. at 492.) Dr. Schunn prescribed compression calf stockings and instructed Plaintiff to lose a significant amount of weight. (R. at 492.)

On May 22, 2009, Plaintiff saw John W. Ayres, M.D. of West End Orthopaedic Clinic, Inc., reporting pain in her lower back that radiated into both legs. (R. at 431.) Plaintiff told Dr. Ayres that the pain began nine years earlier. (R. at 431.) Dr. Ayres noted that Plaintiff had no muscle spasms, swelling, instability or deformities, and that Plaintiff maintained normal range of motion in both hips. (R. at 431.) Dr. Ayres ordered Plaintiff to undergo an EMG of her lower extremities for neuropathy along with four weeks of physical therapy. (R. at 431.)

On June 3, 2009, Plaintiff returned to West End Orthopaedic Clinic. (R. at 429.) Charles W. Vokac, M.D. conducted nerve conduction testing and a needle EMG. (R. at 429.) Dr. Vokac reported that Plaintiff's overall testing returned normal results and showed no signs of peripheral neuropathy, bilateral tarsal tunnel syndrome or right L3-S1 radiculopathy. (R. at 429.) Dr. Vokac concluded that despite Plaintiff's diabetes, no obvious evidence of diabetic neuropathy existed, because all nerve testing remained within normal limits. (R. at 429.)

On June 4, 2009, Plaintiff saw Anjanette S. Tan, M.D. of Centra Southside Professional Services Endocrinology for an evaluation of her diabetes. (R. at 488.) Dr. Tan opined that Plaintiff needed to use insulin, because Plaintiff's blood sugar measured in the 300 range. (R. at 488.) Plaintiff refused to start using insulin; therefore, Dr. Tan prescribed glipizide and Duetact. (R. at 488.)

On June 24, 2009, Plaintiff returned to Dr. Ayres. (R. at 428.) Dr. Ayres reviewed the needled EMG results and concluded that no convincing evidence existed showing neuropathy, despite the burning pain that Plaintiff reported in her lower extremities and her diabetes. (R. at 428.) On July 22, 2009, Dr. Ayres noted that an MRI came back normal and did not corroborate her neuropathic symptoms. (R. at 427.) Dr. Ayres referred Plaintiff to a neurologist. (R. at 427.)

On September 3, 2009, Plaintiff returned to Dr. Tan, complaining of back and leg pain. (R. at 499.) Dr. Tan recorded that Plaintiff's blood sugar had improved to between 100 and 150, although she had gained about nineteen pounds since her last visit. (R. at 499.) Dr. Tan also diagnosed Plaintiff with uncontrolled Type 2 diabetes with neuropathy, degenerative disc disease and hypertension. (R. at 499.) Dr. Tan continued Plaintiff's Duetact prescription and advised that Plaintiff should consider epidural injections if her leg pain did not improve with Lyrica. (R. at 500.) Plaintiff opposed the possibility of the injections. (R. at 500.)

Plaintiff treated with Blackstone Family Practice Center periodically between June 1999 and March 2009 for various medical conditions, including diabetes mellitus, hypertension, obesity, depression, headaches, asthma, and neck and back pain. (R. at 495-96, 498, 525, 529, 537-38, 541.) On February 22, 2010, Carlos S. Villar-Gosalez, M.D. prescribed a cane to Plaintiff for assistance in ambulation. (R. at 318.)

4

Plaintiff saw Robert S. Adelaar, M.D. of VCU Health System, Department of Orthopaedic Surgery, periodically beginning in September 2000 for various medical issues, including wrist discomfort and carpal tunnel syndrome. (R. at 564.) On May 3, 2010, Plaintiff visited Dr. Adelaar, complaining primarily of pain and discomfort in her right wrist and left ankle. (R. at 825.) Dr. Adelaar noted that Plaintiff maintained good range of motion in her wrist. (R. at 825.) However, an x-ray indicated a mild tendon condition on the right wrist. (R. at 825.) Plaintiff's ankle x-ray also returned normal results and Dr. Adelaar opined that there was no available treatment to alleviate her symptoms. (R. at 825-26.)

On August 9, 2010, Plaintiff followed-up with Dr. Villar-Gosalez regarding her diabetic symptoms, breathing problems and chest pains. (R. at 725-26.) Dr. Villar-Gosalez noted that Plaintiff was oriented and in no respiratory distress, but anxious. (R. at 726.) Dr. Villar-Gosalez concluded that Plaintiff's diabetes remained well-controlled and referred her to cardiology and pulmonary departments to address her panic-anxiety syndrome, chest pains and shortness of breath. (R. at 726.)

On August 25, 2010, Dr. Villar-Gosalez completed a Medical Source Statement concerning the nature and severity of Plaintiff's diabetes. (R. at 574-78.) Dr. Villar-Gosalez indicated that he had treated Plaintiff five times between March 13, 2009, and August 9, 2010. (R. at 574.) Dr. Villar-Gosalez noted that Plaintiff's symptoms included difficulty walking, general malaise, psychological problems, diarrhea, difficulty in concentrating and anxiety. (R. at 574.)

Dr. Villar-Gosalez assessed that Plaintiff could perform low-stress jobs. (R. at 575.) Plaintiff could sit for more than two hours without interruption and stand for approximately ten minutes without interruption. (R. at 575.) During an eight-hour workday, Plaintiff could sit for

5

approximately four hours, stand for less than two hours and walk for less than two hours. (R. at 575.) Plaintiff would need a job that permitted shifting positions at will from sitting, standing and walking, and permitted unscheduled breaks. (R. at 576.) Dr. Villar-Gosalez determined that Plaintiff could rarely lift and carry less than ten pounds and would have significant limitations repeatedly reaching, handling or fingering. (R. at 576-77.) Plaintiff could never climb ladders or stairs, twist, bend, stoop or crouch. (R. at 576.) In addition to physical limitations, Dr. Villar-Gosalez opined that emotional factors, including depression and anxiety, contributed to the severity of Plaintiff's symptoms and functional limitations. (R. at 574.)

Dr. Villar-Gosalez determined that Plaintiff required environmental restrictions. (R. at 577.) Specifically, Plaintiff could endure extreme cold and heat, but needed to avoid concentrated exposure to high humidity, wetness, solvents or cleaners, dust and chemicals, moderate exposure to perfumes, soldering fluxes and fumes, odors and gases, and could never be exposed to cigarette smoke. (R. at 577.) Dr. Villar-Gosalez estimated that Plaintiff's impairments would likely produce "good" and "bad" days and result in more than four days absent from work per month. (R. at 577.)

On January 3, 2011, Plaintiff returned to Dr. Villar-Gosalez, complaining of chronic right knee pain and foot pain. (R. at 721.) Plaintiff noted her concern about her swollen feet and possible tumors. (R. at 721.) Plaintiff appeared alert and oriented, although her mood appeared anxious. (R. at 722.) Dr. Villar-Gosalez's physical exam notes stated that Plaintiff suffered from joint pain, left and right ankle tenderness and decreased range of motion in her right knee. (R. at 721-22.) Dr. Villar-Gosalez prescribed ibuprofen for Plaintiff's knee and foot pain, and referred her to a podiatry specialist. (R. at 723.)

On January 21, 2011, Plaintiff saw Aerial Avery, D.P.M. of New Age Foot & Ankle Surgery, LLC, as a new patient for diabetic foot care. (R. at 626.) Plaintiff reported burning in both feet and stated that she felt depressed. (R. at 626.) Dr. Avery diagnosed Plaintiff with Type 2 non-insulin diabetes and peripheral neuropathy. (R. at 627.) Dr. Avery prescribed Lyrica and anodyne treatments. (R. at 627.)

On March 2, 2011, Plaintiff returned to Dr. Avery, complaining of neuropathic pain in both feet and hands. (R. at 628.) Plaintiff had not undergone anodyne treatments, because she reported that her insurance did not cover them. (R. at 628.) Dr. Avery advised Plaintiff of general diabetic foot care, recommended wider shoe gear and instructed her to continue Lyrica. (R. at 629.)

On March 4, 2011, Plaintiff saw P. Lenoach, M.D. of Centra Southside Orthopedic and Rehab Center, complaining of right knee pain and sensitivity. (R. at 662.) On examination, Dr. Lenoach reported that Plaintiff appeared to be relatively comfortable until the examination began. (R. at 662.) An x-ray appeared normal and revealed no signs of swelling, instability or effusion in Plaintiff's right knee. (R. at 662.) Dr. Lenoach concluded that the symptoms were consistent with chondromalacia and prescribed physical therapy two to three days per week for three to six weeks. (R. at 661.)

On April 8, 2011, Dr. Avery completed a physical RFC questionnaire. (R. at 887.) Dr. Avery noted that Plaintiff had diabetes and peripheral neuropathy with symptoms that included tingling, burning, numbness and paresthesias in her bilateral lower extremities. (R. at 887.) Dr. Avery reported that Plaintiff took Lyrica and underwent anodyne treatments. (R. at 888.) Dr. Avery also found that Plaintiff could continuously sit for more than two hours and stand for forty-five minutes. (R. at 889.) Additionally, Dr. Avery opined that Plaintiff's symptoms

7

resulted in constant attention and concentration interference, and would cause Plaintiff to be

absent from work more than three times per month.  (R. at 888, 891.)

On April 29, 2011, Plaintiff saw Sung Seo, M.D. of Southside Community Services

Board for a psychiatric evaluation.  (R. at 814.)  Plaintiff reported that her depression had been a

life-long problem that worsened in 2003 when she witnessed her fiancé die in front of her.  (R. at

814.)  Plaintiff identified her uncle and father's deaths as contributing events to her depression.

(R. at 814.)  Plaintiff denied mood swings, but admitted to panic attacks when encountering other

people and to occasionally hearing voices.  (R. at 814.)  Dr. Seo noted that Plaintiff appeared

alert, oriented, with good judgment and normal speech.  (R. at 815.)  Dr. Seo diagnosed Plaintiff

with major depressive disorder, recurrent, severe with psychotic features, panic disorder and

agoraphobia.  (R. at 816.)  Additionally, Dr. Seo assigned Plaintiff a Global Assessment of

Functioning ("GAF") score[3] of 50.  (R. at 816.)  Dr. Seo prescribed Plaintiff Abilify and Prozac

and instructed her to avoid weight affecting medicine.  (R. at 816.)

On May 18, 2011, Plaintiff returned to Dr. Seo for a medication management visit.  (R. at

816.)  During the appointment, Dr. Seo noted that Plaintiff appeared alert, oriented and less

depressed than her first visit.  (R. at 816.)  Plaintiff reported feeling a little better, calmer and

relaxed.  (R. at 816.)  Plaintiff stated that she had fewer panic attacks, but felt guilty, because she

---

[3]     The GAF is a numeric scale (0 through 100) used by mental health clinicians and
physicians to rate the social, occupational and psychological functioning of adults.  Scores
ranging from 41-50 indicate serious symptoms or serious impairment in social, occupational or
school functioning.  Scores ranging from 51-60 indicate moderate symptoms or moderate
difficulty in social, occupational or school functioning.  (R. at 20-21.)  Notably, the latest version
of the Diagnostic and Statistical Manual of Mental Disorders ("DSM") has dropped the use of
GAF scores, finding that their use has been criticized due to a "conceptual lack of clarity," and
"questionable psychometrics in routine practice."  DSM-5 16 (American Psychiatric Association
2013).

was unable to complete housework. (R. at 816.) Dr. Seo continued Plaintiff's Abilify and Prozac prescription and instructed her to follow-up in one month. (R. at 816.)

On May 31, 2011, Plaintiff followed-up with Dr. Villar-Gosalez regarding her diabetes, hypertension and hyperlipidemia. (R. at 709.) Plaintiff also complained of joint pain and depression. (R. at 709.) Plaintiff's chart indicated that she suffered from neck, back and joint pain, depression, memory loss and decreased range of motion in her right and left knees. (R. at 710-11.) Dr. Villar-Gosalez noted that Plaintiff appeared oriented, but exhibited an anxious, agitated and depressed mood. (R. at 711.) Dr. Villar-Gosalez prescribed hemoglobin, TSH, Abilify and Prozac to help Plaintiff's depression, panic-anxiety syndrome, hypertension and poorly controlled diabetes. (R. at 711.)

On June 15, 2011, Plaintiff followed-up with Dr. Seo for a second medication management appointment. (R. at 817.) Dr. Seo recorded that Plaintiff appeared calm, cooperative and oriented, with normal speech and mood. (R. at 817.) Plaintiff reported that the medications helped her and that she felt better, although she continued to hear voices. (R. at 817.) Dr. Seo increased Plaintiff's Abilify prescription by two and a half milligrams and continued her Prozac prescription. (R. at 817.)

On July 25, 2011, Plaintiff returned to Dr. Seo for another medication management appointment. (R. at 782.) Plaintiff reported that she felt better and experienced less panic attacks and heard fewer voices. (R. at 782.) Dr. Seo noted that Plaintiff again appeared calm, relaxed and oriented. (R. at 782.) Dr. Seo instructed Plaintiff to continue medication and follow-up in two months. (R. at 782.)

On August 8, 2011, Plaintiff returned to Dr. Villar-Gosalez, complaining that the steroid injections failed to alleviate her right knee pain. (R. at 770.) Dr. Villar-Gosalez noted that

Plaintiff appeared oriented and exhibited normal mood, but suffered from depression. (R. at 770.) He prescribed Lyrica for Plaintiff's depression and referred her to an orthopedic specialist for her right knee pain. (R. at 771.)

On September 2, 2011, Plaintiff saw Scott Frank, PA-C, of Ortho Virginia West End Orthopaedic Clinic, complaining of a popping and grinding sensation in both knees. (R. at 760.) Plaintiff asserted that her right knee gave out on her and caused sharp pains. (R. at 760.) Plaintiff rated her pain as a five on a one-to-ten pain scale. (R. at 760.) Additionally, Plaintiff denied any alleviating factors, previous injuries, numbness or tingling in her feet or any pain in her left knee. (R. at 760.)

Upon examination, Physician's Assistant Frank noted that Plaintiff appeared cooperative, alert and oriented. (R. at 760.) He observed mild swelling, but no bruising, deformity or misalignment to Plaintiff's right knee. (R. at 760.) Plaintiff exhibited normal gait. (R. at 760.) After ordering x-rays of Plaintiff's right knee, Physician's Assistant Frank found no signs of acute fracture, dislocation or degenerative joint disease. (R. at 760.) Physician's Assistant Frank ordered an MRI and instructed Plaintiff to follow-up for an appropriate treatment plan. (R. at 760.)

On September 19, 2011, Plaintiff did not show up for her appointment with Dr. Seo, according to Dr. Seo's psychiatric interview notes. (R. at 782.)

Plaintiff underwent an MRI at Bon Secours St. Francis Imaging Center on September 29, 2011. (R. at 763.) The MRI revealed largely normal results, but evidenced some trace joint effusion and patellofemoral chondromalacia. (R. at 763-64.)

On December 14, 2011, Plaintiff saw Dr. Adelaar, complaining of bilateral knee pain. (R. at 827.) After an examination, Dr. Adelaar determined that Plaintiff's quads were not strong,

despite twelve sessions of physical therapy and home exercises. (R. at 827.) Dr. Adelaar recommended an arthroscopy procedure to clean out Plaintiff's patella and release pressure on her right knee. (R. at 827.)

On January 9, 2012, Southside Community Services Board discharged Plaintiff from treatment for non-compliance. (R. at 859.) The discharge summary did not include functional limitations or progress notes due to Plaintiff's non-compliance and incomplete treatment. (R. at 859.) On February 23, 2012, Dr. Adelaar performed an arthroscopy procedure with debridement and chondroplasty on Plaintiff's right knee. (R. at 829.) Dr. Adelaar discharged Plaintiff the same day. (R. at 833.)

On August 30, 2012, Plaintiff returned to Dr. Villar-Gosalez complaining of hip pain and inflammation. (R. at 843.) Dr. Villar-Gosalez drained Plaintiff's hip inflammation and performed a triamcinolone acetonide injection. (R. at 843.) Dr. Villar-Gosalez also referred Plaintiff to a psychiatric doctor for an assessment of probable bipolar affective disorder. (R. at 843.)

On November 21, 2012, Plaintiff returned to Southside Community Services Board, seeking outpatient treatment for depression, anxiety and bipolar disorder. (R. at 861, 863.) In an initial assessment form, Plaintiff appeared alert and well-oriented, but reported being depressed, and anxious with a flattened affect. (R. at 863.) Plaintiff also reported depressive-like behavior, including sadness, fatigue, loss of interest or pleasure and feelings of worthlessness. (R. at 863.) Plaintiff reported that she did not have impaired mobility. (R. at 864.) Angela Poythress-Lee, LPC noted that Plaintiff did not meet the requirement for serious mental illness and outlined a one-year treatment plan. (R. at 864.) The treatment plan consisted of four appointments, spaced

11

three months apart, scheduled for February 21, May 21, August 21 and November 21. (R. at 864-65.)

On January 30, 2013, Plaintiff returned to Dr. Seo for a psychiatric evaluation. (R. at 876.) Plaintiff reported experiencing auditory hallucinations, delusions, sadness and anxiety. (R. at 876.) Dr. Seo noted that Plaintiff appeared fluent, coherent and cooperative throughout the meeting. (R. at 877.) Dr. Seo diagnosed Plaintiff with bipolar II and major depressive disorder. (R. at 877.) Additionally, Dr. Seo assigned a GAF score of 60, indicating moderate mental limitations. (R. at 878.) Dr. Seo prescribed Prozac and Seroquel. (R. at 878.)

On February 27, 2013, Plaintiff returned to Dr. Seo for a medication management session. (R. at 879.) Plaintiff reported that she felt better and more relaxed. (R. at 879.) Plaintiff indicated concern about forgetfulness and concentration problems and sought advice on the risks and benefits of Ritalin. (R. at 879.) Dr. Seo noted that Plaintiff exhibited typical behaviors and remained calm, relaxed and in a normal mood with normal speech throughout the session. (R. at 879.) Dr. Seo continued Plaintiff's Prozac and Seroquel dosages and prescribed Ritalin. (R. at 879-81.)

C. Non-Treating State Agency Physicians' Opinions

On August 2, 2011, Donald K. Bruce, M.D., a state agency physician, assessed Plaintiff's impairments. (R. at 103-05.) Dr. Bruce concluded that Plaintiff had the severe medically determinable impairments of major joints dysfunction, along with affective and anxiety disorders. (R. at 104.) Plaintiff also had the non-severe MPIs of diabetes mellitus, essential hypertension, obesity, asthma, peripheral neuropathy and gastrointestinal system disorders. (R. at 104.) Plaintiff's affective and anxiety disorders likely produced moderate difficulties in

maintaining social functioning, concentration, persistence or pace, and mild restrictions to her daily living activities. (R. at 104.)

With respect to Plaintiff's mental RFC, Dr. Bruce concluded that Plaintiff was not significantly limited in her ability to ask simple questions, accept instruction and criticism from supervisors, and maintain socially acceptable behavior with co-workers. (R. at 108-09.) In regards to her concentration and persistence limitations, Dr. Bruce remarked that although Plaintiff suffered from depression with poor sleep, anhedonia, anxiety and hallucinations, she demonstrated good memory and attention during examinations. (R. at 108.) Dr. Bruce assessed that Plaintiff had moderate limitations understanding and remembering detailed instructions. (R. at 108.)

On November 4, 2011, Dr. Stephen P. Saxby, Ph.D., a state agency physician, reviewed Plaintiff's medical records and completed a mental RFC assessment. (R. at 126.) Dr. Saxby indicated that Plaintiff had understanding and memory limitations, sustained concentration and persistence limitations, and social interaction limitations. (R. at 126-27.)

Dr. Saxby explained that Plaintiff's major depression and panic disorder moderately limited her ability to understand and remember detailed instruction. (R. at 126.) Plaintiff was not significantly limited in her ability to remember locations and work-like procedures, and to understand and remember very short and simple instructions. (R. at 126.) Regarding her sustained concentration and persistence limitations, Dr. Saxby reported that Plaintiff was moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in proximity to others without being distracted by them and complete a normal workday without an unreasonable number and length of rest periods. (R. at 127.) Additionally, she experienced moderate limitations in her ability to interact

appropriately with the general public; however, Plaintiff was not significantly limited in her abilities to ask simple questions, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers, maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. at 127.) Dr. Saxby attributed these social limitations to her symptoms of major depression and panic disorder coupled with agoraphobia. (R. at 127.)

   D. Function Reports

      1. Plaintiff's Function Report

Plaintiff completed an undated Function Report. (R. at 289-299.) Plaintiff indicated that she lived with her husband and son. (R. at 289.) On a typical day, Plaintiff took care of her family by completing light cooking and housework. (R. at 290.) Plaintiff's illnesses and injuries did not affect her ability to care for herself; however, she experienced pain in her hands due to rheumatoid arthritis. (R. at 291.)

Plaintiff went outside about five times per day. (R. at 292.) She indicated that when she traveled, she walked with a cane, drove or rode in a car and used public transportation. (R. at 292.) Plaintiff shopped for groceries and personal items about once per month. (R. at 292.) Plaintiff could manage money by paying bills, counting change, handling a savings account and using a checkbook or money orders. (R. at 292.) Recreationally, Plaintiff read and watched the news, although she reported concentration and memory problems. (R. at 293.) Plaintiff indicated that she needed reminders to go places. (R. at 293.) Plaintiff spent time with other people talking on the phone and in person. (R. at 293.) She got along with authority figures very well and had never been fired or laid off from a job for personal problems. (R. at 295.)

Plaintiff indicated that her illnesses and conditions affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, follow instructions and remember, concentrate and understand tasks. (R. at 294.) Plaintiff could sit for about four hours, stand for about ten minutes, walk less than two hours and lift less than ten pounds. (R. at 294.) Plaintiff could pay attention for approximately thirty minutes. (R. at 294.) Plaintiff stated that she used a cane, brace and glasses at all times. (R. at 295.)

    2.   Third-Party Function Report

On July 7, 2011, Walter Pettus, Plaintiff's friend for nine years, completed a Third-Party Function Report. (R. at 255-65.) Mr. Pettus indicated that while he did not know Plaintiff's daily activities, he indicated that she cared for her husband and two children by completing light cooking. (R. at 256.) He called Plaintiff on a daily basis to remind her to take her medication. (R. at 258.) He did not know how long household chores took Plaintiff and indicated that when Plaintiff left the house, she could drive herself and use public transportation. (R. at 259.) Mr. Pettus stated that Plaintiff was capable of managing money by paying bills, counting change, handling a savings account and using a checkbook or money orders. (R. at 260.) Plaintiff did not have any problems getting along with others, and she spent time with other people. (R. at 261.) Mr. Pettus also indicated that Plaintiff had never been fired or laid off from a job because of problems getting along with other people. (R. at 262.) Finally, Mr. Pettus remarked that Plaintiff lacked physical capacities that affected her ability to lift, stair-climb, sit, see and walk, as well as mental capacities that limited her ability to follow instructions, maintain concentration and retain memories. (R. at 264.)

    E.   Plaintiff's Testimony

On March 28, 2013, Plaintiff (represented by counsel) testified via video appearance during a hearing before the ALJ. (R. at 35-53.) Plaintiff was forty-two years old with a high school education and certified nursing assistant training. (R. at 36, 38.) She resided with her seventeen-year-old son and her husband. (R. at 37.) Plaintiff had applied for nursing and housekeeping positions in the last year, but received no interviews. (R. at 36.)

Plaintiff stated that her medical impairments included depression, trouble concentrating, arthritis in her whole body and neuropathy. (R. at 39.) These impairments rendered her hands without strength and resulted in tingling and burning in her feet. (R. at 39.) She stated that she had seen Dr. Avery for approximately two years for her neuropathy. (R. at 40.) He prescribed Lyrica and required her to wear two braces on her legs, extending from her hips to her ankles. (R. at 40.) Plaintiff saw Dr. Villar-Gosalez for approximately six or seven years for high blood pressure, cholesterol, diabetes, asthma, depression, anxiety and issues for her feet. (R. at 41.) Plaintiff testified that her diabetes was uncontrolled, running from 300 to 400 despite taking a sugar pill twice a day and insulin at night. (R. at 42.) Her poorly-controlled diabetes resulted in lethargy and in severe gum disease, causing rotten gums and loose teeth. (R. at 43.)

Plaintiff testified that her neuropathy resulted from her uncontrolled diabetes. (R. at 43.) She reported that the neuropathy caused sharp pain, burning and numbness in her legs, toes, heels and underneath her feet. (R. at 43.) She stated that although she followed a strict diet and exercise regimen, her condition had not improved. (R. at 44.) Plaintiff testified that she felt depressed all of the time and that she sought mental health treatment from a counselor and doctor every month at Mecklenburg Behavioral Mental Health in Boydton. (R. at 45.) She stated that the medication that her doctor prescribed worked, but did not necessarily help her. (R. at 46.)

16

Plaintiff testified that pain limited her physical abilities. (R. at 51.) She could lift five or ten pounds comfortably. (R. at 51.) As a result of her carpal tunnel syndrome, Plaintiff testified that she could not grip with her right hand. (R. at 51.) Additionally, Plaintiff reported experiencing pain running down her lower back, hips and legs when she sat down due to her arthritis. (R. at 51.)

During a typical morning, Plaintiff showered, prepared herself a small breakfast, took her medication and made her bed. (R. at 48-49.) She completed laundry, light cooking and housecleaning, all while taking forty-five minute breaks in between chores. (R. at 48-50.) Plaintiff testified that she could walk about forty-five minutes with a cane before needing to sit down and rest. (R. at 50.) Plaintiff had difficulty reaching overhead and could not squat or crouch down. (R. at 51-52.) Although Plaintiff testified to having good and bad days, she testified that her bad days could be as frequent as every other day. (R. at 52.) She attributed her bad days to mood swings, pains and her bipolar affective disorder. (R. at 52.)

F. Vocational Expert Testimony

During the March 28, 2013 hearing, a VE also testified. (R. at 53-60.) The ALJ asked the VE if a hypothetical person of the same age, education and work experience as Plaintiff, could perform light work, with the limitations of only occasionally climbing ramps and stairs, balancing, stooping, kneeling, crouching and crawling, but never climbing ladders, ropes or scaffolds. (R. at 54.) This light work would also be limited to simple routine and repetitive tasks in a low-stress work environment, with only occasional independent decision-making and changes in the workplace setting. (R. at 54.) The VE testified that such a person could perform work in the national economy. (R. at 54.) These jobs included working as a cleaner, with over 377,000 positions in the national economy and 11,000 in Virginia, and as a packer, with over

320,000 positions in the national economy and over 7,000 positions in Virginia. (R. at 54-55.) The VE testified that an additional limitation restricting the individual to only occasional interaction with the public or occasional work with other employees would not impact either job. (R. at 55-56.)

The VE testified that jobs existed in the national and regional economy for an individual limited to a sedentary level of exertion with the same physical limitations. (R. at 55.) These jobs included a general production worker working with small parts assembly, with over 39,000 positions in the national economy and over 900 positions in Virginia, and a material handler, with over 48,000 positions in the national economy and over 1,100 positions in Virginia. (R. at 55.) The VE testified that an additional limitation restricting the individual to only occasional interaction with the public or occasional work with other employees would not impact either job. (R. at 55-56.)

The VE further testified that if the individual required the assistance of a hand-held assistive device, such as a cane, all light work would be eliminated and the individual would be limited to sedentary jobs. (R. at 56.)

## II.    PROCEDURAL HISTORY

On March 23, 2011, Plaintiff filed an application for SSI, claiming disability due to back problems, pinched nerve, high blood pressure, diabetes asthma, arthritis, rheumatoid arthritis, osteoarthritis, carpal tunnel syndrome, gastro esophageal reflux disease, dyspnea, neuropathy, scolosis disease, chronic venous insufficiency, chrondromalacia of the right knee and trouble walking, sitting, seeing and remembering things with an alleged onset date of February 25, 2011. (R. at 227, 244.) Plaintiff's claim was denied initially on August 2, 2011, and upon reconsideration on November 7, 2011. (R. at 13.) On March 28, 2013, Plaintiff (represented by

counsel) testified before the ALJ during a hearing. (R. at 31-61.) On April 18, 2013, the ALJ

issued a written decision denying Plaintiff's claim and concluded that Plaintiff was not disabled

under the Act, because Plaintiff could perform work that existed in the national economy. (R. at

13-25.) On August 18, 2014, the Appeals Council denied Plaintiff's request for review,

rendering the ALJ's decision the final decision of the Commissioner subject to judicial review by

this Court. (R. at 1-5.)

### III. QUESTIONS PRESENTED

1. Did the ALJ err in determining that Plaintiff's peripheral neuropathy was a non-severe impairment?

2. Did the ALJ err in determining Plaintiff's RFC?

3. Did the ALJ err in posing the hypothetical to the VE?

4. Did the ALJ err in the weight afforded to Dr. Avery's opinion and Dr. Villar-Gosalez's opinion?

### IV. STANDARD OF REVIEW

In reviewing the Commissioner's decision to deny benefits, the Court is limited to

determining whether substantial evidence in the record supports the Commissioner's decision

and whether the proper legal standards were applied in evaluating the evidence. *Hancock v.*

*Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (citing *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th

Cir. 2005)). Substantial evidence is more than a scintilla, is less than a preponderance, and is the

kind of relevant evidence that a reasonable mind could accept as adequate to support a

conclusion. *Id.*; *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996).

To determine whether substantial evidence exists, the Court must examine the record as a

whole but may not "undertake to re-weigh conflicting evidence, make credibility determinations,

or substitute [its] judgment for that of the [ALJ]." *Hancock*, 667 F.3d at 472 (quoting *Johnson*,

434 F.3d at 653); *Mastro v. Apfel*, 270 F.3d 171, 176 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at

589). In considering the decision of the Commissioner based on the record as a whole, the Court

must "take into account whatever in the record fairly detracts from its weight." *Breeden v.

Weinberger*, 493 F.2d 1002, 1007 (4th Cir. 1974) (quoting *Universal Camera Corp. v. N.L.R.B.*,

340 U.S. 474, 488 (1951)) (internal quotation marks omitted). The Commissioner's findings as

to any fact, if substantial evidence in the record supports the findings, are conclusive and must be

affirmed regardless of whether the reviewing court disagrees with such findings. *Hancock*, 667

F.3d at 476 (citation omitted). The substantial evidence standard presupposes "a zone of choice"

allowing a decision-maker to go either way, and the ALJ's decision "is not subject to reversal

merely because substantial evidence would have supported an opposite decision." *Dunn v.

Colvin*, __ F. App'x __, 2015 WL 3451568, at *2 (4th Cir. June 1, 2015) (unpublished) (quoting

*Clarke v. Bowen*, 843 F.2d 271, 272-73 (8th Cir. 1988)). If substantial evidence in the record

does not support the ALJ's determination or if the ALJ has made an error of law, the Court must

reverse the decision. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A sequential evaluation of a claimant's work and medical history is required to determine

if a claimant is eligible for benefits. 20 C.F.R. §§ 404.1520, 416.920; *Mastro v. Apfel*, 270 F.3d

at 177. An ALJ conducts the analysis for the Commissioner, and it is that process that a court

must examine on appeal to determine whether the correct legal standards were applied, and

whether substantial evidence in the record supports the decision of the Commissioner. *Mastro*,

270 F.3d at 176-77.

To determine whether a claimant is disabled, the ALJ must engage in a five-step process.

*Mascio*, 780 F.3d at 634. At step one, the ALJ must determine whether the claimant has been

working. *Id.* At step two, the ALJ must determine whether a claimant's medical impairments

meet the regulations' severity and duration requirements. *Id.* At step three, the ALJ determines whether the impairments meet or equal an impairment listed in the regulations. *Id.* Before moving to step four, the ALJ must also determine a claimant's residual functional capacity ("RFC"), which is "the most" that a claimant can do, despite physical and mental limitations that affect the claimant's ability to work. *Id.* at 635. At step four, the ALJ must determine whether the claimant can return to past work given the claimant's RFC. *Id.* at 634. Finally, at step five, the ALJ must determine whether plaintiff may perform other work existing in the economy. *Id.*

## V.    ANALYSIS

### A.  The ALJ's Decision

On April 18, 2013, the ALJ rendered his opinion in a written decision that found that Plaintiff was not disabled under the Act. (R. at 13-25.) The ALJ followed the five-step sequential evaluation process as established by the Act in analyzing whether Plaintiff was disabled. (R. at 13-15.)

At step one, the ALJ determined that Plaintiff had not engaged in SGA from Plaintiff's alleged onset date through Plaintiff's last insured date. (R. at 15.) At step two, the ALJ determined that Plaintiff suffered the severe impairments of right knee patellar chondromalacia status post-arthroscopy, obesity, diabetes, affective disorder and anxiety. (R. at 15.) At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix I. (R. at 16.)

The ALJ further found that Plaintiff maintained the RFC to perform light work as defined by 20 C.F.R. § 416.967(b), but with certain limitations. (R. at 18.) Plaintiff could perform simple, routine, repetitive tasks in a low-stress work setting involving only occasional decision

making and changes in the workplace setting, and could occasionally interact with the public and work in tandem with others. (R. at 18.) She could occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. (R. at 18.) The ALJ further indicated that Plaintiff should never climb ladders, ropes or scaffolds. (R. at 18.)

At step four, the ALJ found that Plaintiff could not return to her past work. (R. at 23.) Finally, at step five of the analysis, based on VE testimony and answers to interrogatories and considering Plaintiff's age, education, work experience and RFC, the ALJ determined that Plaintiff could perform jobs existing in significant numbers in the national economy, including as a cleaner at the light unskilled level, packer at the light unskilled level, general production worker which includes small part assembly at the sedentary unskilled level and material handler at the sedentary unskilled level. (R. at 24.) Accordingly, the ALJ determined that Plaintiff was not disabled under the Act. (R. at 25.)

Plaintiff now challenges the ALJ's decision on four grounds. First, Plaintiff argues that the ALJ erred in determining that Plaintiff's peripheral neuropathy was a non-severe impairment. (Pl.'s Mem. at 24-25.) Second, Plaintiff contends that the ALJ erred in determining Plaintiff's RFC. (Pl.'s Mem. at 25-30.) Third, Plaintiff asserts that the ALJ erred in formulating the hypothetical to the VE. (Pl.'s Mem. at 28.) Finally, Plaintiff argues that the ALJ erred in assessing Dr. Avery's and Dr. Villar-Gosalez's opinions as treating physicians. (Pl.'s Mem. at 22-24.) Defendant maintains that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 12-22.)

B. The ALJ did not err in finding that Plaintiff's peripheral neuropathy is not a severe impairment.

Plaintiff argues that the ALJ erred by finding that Plaintiff's peripheral neuropathy is not a severe impairment. (Pl.'s Mem. at 24-25.) Defendant contends that substantial evidence

supports the ALJ determination, because Plaintiff's peripheral neuropathy does not create more than a minimal effect on Plaintiff's ability to perform work activity. (Def.'s Mem. at 15-17.)

At the second step of the ALJ's sequential analysis, Plaintiff is required to prove that she has a "severe impairment...or combination of impairments which significantly limit[s] [her] physical or mental ability to do basic work activities." 20 C.F.R. §§ 416.920(c), 404.1520(c). Under the Act, a severe impairment that entitles one to benefits must cause more than a minimal effect on one's ability to function. 20 C.F.R. § 404.1520(c). Likewise, "[a]n impairment or combination of impairments is not severe if it does not significantly limit [Plaintiff's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a).

The regulations require that Plaintiff be found not disabled at step two if she "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement in § 404.1509, or a combination of impairments that is severe and meets the duration requirement." 20 C.F.R. § 404.1520(a)(4)(ii). Section 1509 requires that Plaintiff's impairment "must have lasted or must be expected to last for a continuous period of at least 12 months." 20 C.F.R. § 404.1509. Plaintiff bears the burden of demonstrating that an impairment is severe. *Yuckert*, 428 U.S. at 146.

Here, the ALJ determined that Plaintiff suffered from severe impairments in the form of right knee patellar chondromalacia status post-arthroscopy, obesity, diabetes, affective disorder and anxiety. (R. at 15.) However, the ALJ noted that Plaintiff experienced other impairments, including peripheral neuropathy, that he found to be non-severe. (R. at 15.)

Substantial evidence supports the ALJ's determination that Plaintiff's peripheral neuropathy was not severe, because the condition had no more than a minimal effect on the

ability to do basic work activities.[4] In 2009, Dr. Vockac reported that Plaintiff's overall testing returned normal results and showed no signs of peripheral neuropathy. (R. at 429.) That same year, Dr. Ayres concluded that no convincing evidence of neuropathy existed. (R. at 428.) Further, an MRI did not corroborate her neuropathic symptoms. (R. at 427.) About a year later, Dr. Avery diagnosed Plaintiff with peripheral neuropathy. (R. at 627.) Dr. Avery prescribed Lyrica and anodyne treatments. (R. at 627.) During a follow-up appointment in March 2011, Plaintiff reported that she had not undergone anodyne treatments, and Dr. Avery recommended wider diabetic shoe gear and advised Plaintiff of general diabetic foot care. (R. at 628-29.) Dr. Avery noted that Plaintiff had peripheral neuropathy with symptoms, including tingling, burning, numbness and paresthesias in her bilateral lower extremities. (R. at 887.) However, in September 2011, during an examination by Physician's Assistant Frank, Plaintiff walked with a normal gait and denied having any numbness or tingling in her feet. (R. at 760.) A sensory examination conducted by Physician's Assistant Frank rendered normal results. (R. at 760.) Additionally, Dr. Bruce, the state agency physician, assessed Plaintiff's impairments and determined that Plaintiff's peripheral neuropathy was non-severe. (R. at 104.)

Plaintiff's own statements further support the ALJ's determination. Plaintiff indicated that she cared for her family by completing light cooking and housework. (R. at 290.) Plaintiff's illnesses and injuries did not affect her ability to care for herself; however, she experienced pain in her hands due to rheumatoid arthritis. (R. at 291.) Furthermore, Plaintiff went outside about five times per day. (R. at 292.) She indicated that when she traveled, she walked with a cane,

---

[4] Although two tests exist to determine impairment severity, Plaintiff only challenges the ALJ's decision to the extent that it addressed the "minimal effect" on the ability to do basic work activities.

drove or rode in a car and used public transportation. (R. at 292.) Plaintiff could sit for about four hours, stand for about ten minutes and walk for less than two hours. (R. at 294.)

Plaintiff testified that she completed light cooking and housework. (R. at 35-53.) During a typical morning, Plaintiff showered, prepared herself a small breakfast, took her medication and made her bed. (R. at 48-49.) She did laundry, light cooking and housecleaning, all while taking forty-five minute breaks in between chores. (R. at 49-50.) Plaintiff testified that she could walk about forty-five minutes with a cane before needing to sit down and rest. (R. at 50.) While Plaintiff testified generally that pain limited her physical abilities, she attributed the pain running down her lower back, hips and legs to arthritis diagnosed by Dr. Villar-Gosalez. (R. at 51.) Therefore, substantial evidence supports the ALJ's basis for finding that Plaintiff's peripheral neuropathy did not constitute a severe impairment.

C. The ALJ did not err in determining Plaintiff's RFC.

Plaintiff argues that the ALJ erred in assessing Plaintiff's RFC, because it did not account for all of Plaintiff's mental or physical limitations and did not consider the opinions of Plaintiff's treating physicians and state agency physicians. (Pl.'s Mem. at 25-30.) Defendant responds that substantial evidence supports the ALJ's RFC determination. (Def.'s Mem. at 17-22.)

After step three of the ALJ's sequential analysis, but before deciding whether a claimant can perform past relevant work at step four, the ALJ must determine the claimant's RFC. 20 C.F.R. §§ 416.920(e)-(f), 416.945(a)(1). In analyzing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's mental and physical limitations and then determine the claimant's RFC for work activity on a regular and continuing basis. 20 C.F.R. §§ 404.1545(b), 404.1545(c). The RFC must incorporate impairments supported by the objective medical evidence in the record and those impairments that are based on claimant's

credible complaints. 20 C.F.R. § 404.1545(e). Moreover, the ALJ must consider all of the medical evidence in the record. *Craig*, 76 F.3d at 594-95; SSR 96-7p, at 5, n. 3; *see also* SSR 96-8p, *at* 13 (stating that the "RFC assessment must be based on *all* of the relevant evidence in the case record") (emphasis added). Generally, the claimant bears the responsibility to provide the evidence that the ALJ utilizes in making his RFC determination; however, before making a determination that a claimant is not disabled, the ALJ must develop the claimant's complete medical history. 20 C.F.R. § 404.1545(a)(3).

After considering all of Plaintiff's physical and mental impairments, the ALJ found that Plaintiff had the RFC to perform light work with certain limitations. (R. at 18.) Specifically, Plaintiff was limited to perform simple, routine, repetitive tasks and could never climb ladders, ropes or scaffolds. (R. at 18.) The ALJ further found that, despite Plaintiff's limitations from her mental impairments, she could perform simple, unskilled work tasks in a low stress environment, involving only occasional decision-making and changes in the workplace setting, with only occasional interaction with the public or other co-workers. (R. at 18.) Substantial evidence supports the ALJ's determination of Plaintiff's mental and physical limitations.

1. Plaintiff's Mental Limitations

Plaintiff argues that the ALJ's RFC determination was flawed, because he did not properly consider the state agency physician's opinion that Plaintiff was moderately limited in her ability to complete a normal workweek without interruptions from psychologically based symptoms. (Pl.'s Mem. at 26.) Defendant maintains that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 17-21.) Contrary to Plaintiff's assertion, the ALJ did consider alleged limitations caused by Plaintiff's mental impairments and substantial evidence supports the ALJ's findings.

Medical records support the ALJ's determination regarding Plaintiff's mental limitations. On August 9, 2010, Dr. Villar-Gosalez noted that Plaintiff appeared alert and oriented to person, place and time. (R. at 726.)  On August 25, 2010, Dr. Villar-Gosalez assessed that despite Plaintiff's depression diagnosis, Plaintiff could perform low-stress jobs. (R. at 575.)  On March 4, 2011, Dr. Lenoach reported that Plaintiff remained relatively comfortable until her examination began. (R. at 662.)  On August 8, 2011, Dr. Villar-Gosalez indicated that Plaintiff remained oriented and exhibited a normal mood. (R. at 771.)  On September 2, 2011, Physician's Assistant Frank noted that Plaintiff was cooperative, alert and oriented. (R. at 760.)

Dr. Seo reported that Plaintiff appeared alert and oriented during each medication management appointment in May, June and July 2011, as well as in February 2013. (R. at 782, 817, 868, 877.)  On May 18, 2011, Plaintiff reported feeling better after less than one month on medication. (R. at 816.)  On July 25, 2011, Plaintiff again reported that she felt better, experienced fewer panic attacks and heard fewer voices. (R. at 782.)

On November 21, 2012, Plaintiff appeared alert and well-oriented, despite her reported depressed, anxious and flattened mood. (R. at 863.)  On January 30, 2013, Plaintiff appeared fluent, coherent and cooperative. (R. at 877.)  On February 27, 2013, Plaintiff reported that she felt better and more relaxed. (R. at 879.)  Dr. Seo noted that Plaintiff exhibited typical behaviors and remained calm, relaxed and in a normal mood throughout the session. (R. at 879.)  Plaintiff continued Prozac and Seroquel dosages. (R. at 879.)

Third party evidence also supports the ALJ's determination.  Plaintiff's friend, Walter Pettus, indicated that although he called Plaintiff to remind her to take her medication, Plaintiff remained capable of managing money, paying bills and handling a savings and checking account. (R. at 259-60.)  Mr. Pettus indicated that Plaintiff's illness or condition did not affect

her ability to get along with others. (R. at 261.) Plaintiff spent time talking socially with people. (R. at 262.) She got along with authority figures very well, and had never been fired or laid off from a job for failing to get along with others. (R. at 262.)

Plaintiff's statements further support the ALJ's determination. Plaintiff spent time with other people by talking on the phone and in person. (R. at 293.) She responded well to authority figures and had never been fired or laid off from a job for personal problems. (R. at 295.) Plaintiff read and watched the news regularly. (R. at 293.)

Contrary to Plaintiff's assertion, the ALJ considered limitations assessed by the state agency consultants, Dr. Bruce and Dr. Saxby. (R. at 16, 23.) Dr. Bruce opined that Plaintiff was not significantly limited in her ability to ask simple questions, accept instruction and criticism from supervisors, or maintain socially acceptable relations with co-workers. (R. at 108-09.) Dr. Bruce opined that Plaintiff's ability to interact appropriately with the general public was markedly limited. (R. at 108.) Dr. Saxby indicated that Plaintiff was moderately limited in her ability to interact with the general public. (R. at 127.) Dr. Bruce and Dr. Saxby suggested that Plaintiff would be moderately limited in completing a normal workday without interruptions from psychologically based symptoms. (R. at 108, 127.) The ALJ specifically accounted for these limitations by restricting Plaintiff to low-stress work environments with only occasional interaction with the other employees and the general public. (R. at 18.) Therefore, substantial evidence supports the ALJ's determination.

2.  Plaintiff's Physical Limitations

Plaintiff next argues that the ALJ erred in assessing Plaintiff's physical limitations. (Pl.'s Mem. at 28.)  Defendant argues that the ALJ properly calculated Plaintiff's RFC and that substantial evidence supports the ALJ's decision. (Def.'s Mem. at 21.)

Medical records support the ALJ's determination.  On February 22, 2010, Dr. Villar-Gosalez prescribed a cane to Plaintiff for assistance and ambulation.  (R. at 318.)  Dr. Villar-Gosalez indicated that Plaintiff's symptoms included difficulty walking and general malaise.  (R. at 574.)  Despite her physical limitations, Dr. Villar-Gosalez assessed that Plaintiff could perform low-stress jobs.  (R. at 575.)  Plaintiff could sit for more than two hours without interruption and stand for approximately ten minutes without interruption.  (R. at 575.)  During an eight-hour workday, Plaintiff could sit for approximately four hours, stand for less than two hours and walk for less than two hours.  (R. at 575.)  Dr. Avery reported that Plaintiff could sit continuously for more than two hours and stand for forty-five minutes.  (R. at 889.)

On September 2, 2011, Plaintiff visited Physician's Assistant Scott Frank, complaining of knee pain and rated her pain as a five on a ten-point scale.  (R. at 760.)  Plaintiff denied any numbness or tingling in her feet or pain in her left knee.  (R. at 760.)  Physician's Assistant Frank ordered an MRI and noted that Plaintiff exhibited normal gait.  (R. at 760.)  On September 29, 2011, Plaintiff visited Bon Secours St. Francis Imaging Center for the ordered MRI.  (R. at 763.)  The interpreting doctor noted that Plaintiff's MRI results were largely normal.  (R. at 760.)

On February 23, 2012, Dr. Adelaar performed an arthroscopic surgery with debridement and chondroplasty on Plaintiff's right knee.  (R. at 829.)  In his pre-operation final report, Dr. Adelaar noted that Plaintiff had undergone physical therapy and injection treatment, and had used braces for her legs.  (R. at 827.)  Dr. Adelaar discharged Plaintiff on the day of the procedure and he did not prescribe any mobility-assistance mechanism.  (R. at 833.)

Plaintiff's own statements further support the ALJ's decision.  Plaintiff reported that she could complete light cooking and housework on a daily basis.  (R. at 50, 290.)  Plaintiff indicated that her illnesses and injuries did not affect her ability to care for herself.  (R. at 291.)  She

provided for her own personal care and she could dress, bathe, shave, feed herself and use the

toilet. (R. at 290.) Plaintiff went outside about five times per day. (R. at 292.) She stated that

she drove or rode in a car, used public transportation and walked with a cane. (R. at 292.)

Plaintiff could walk with a cane for approximately forty-five minutes before needing to sit down

and rest. (R. at 50.) Therefore, substantial evidence supports the ALJ's RFC assessment.

D. The ALJ did not err at step five.

Plaintiff argues that the ALJ erred at step five of the analysis, because Plaintiff's RFC

was more restrictive than the RFC required to perform light unskilled jobs. (Pl.'s Mem. at 28.)

Defendant responds that the ALJ properly calculated Plaintiff's RFC and relied upon the VE

testimony in coming to the step five determination. (Def.'s Mem. at 21-22.)

At the fifth step of the sequential analysis, the Commissioner must show that, considering

the claimant's age, education, work experience and RFC, the claimant is capable of performing

other work that is available in significant numbers in the national economy. 20 C.F.R.

§§ 404.1520(f), 416.920(f). The Commissioner can carry her burden at the final step with the

testimony of a VE. *Walker*, 889 F.2d at 50. When a VE is called to testify, the ALJ's function is

to pose hypothetical questions that accurately represent the claimant's RFC based on all of the

record evidence and a fair description of all of the claimant's impairments, so that the VE can

offer testimony about any jobs existing in the national economy that the claimant can perform.

*Id.* Only when the hypothetical posed represents all of the claimant's substantiated impairments

will the testimony of the VE be "relevant or helpful." *Id.*

The ALJ provided the above-discussed RFC to the VE at the hearing. (R. at 54.) The VE

testified that, based upon his experience, a hypothetical individual with that RFC could perform

work as an unskilled cleaner, with approximately 377,000 jobs nationally and 11,000 jobs

regionally, and an unskilled packer, with approximately 320,000 jobs nationally and 7,000 jobs regionally. (R. at 54-55.) The VE testified that if the individual required the assistance of a hand-held assistive, such as a cane, she would be limited to exclusively sedentary work. (R. at 56.) Therefore, the VE explained that a hypothetical individual with the above-discussed RFC at a sedentary exertion level would be able to complete work as a general production worker, with approximately 39,000 jobs nationally and 900 jobs regionally, and as a material handler, with approximately 48,000 jobs nationally and 1,100 jobs regionally. (R. at 55.) Based on the testimony of the VE, the ALJ determined at step five that Plaintiff was not disabled under the Act. (R. at 24.)

In this case, the ALJ's hypothetical posed to the VE was appropriate, because it properly accounted for Plaintiff's RFC. As noted above, substantial evidence supports the ALJ's RFC determination. Because the hypothetical posed to the VE took into account all of the Plaintiff's physical and mental limitations described in the RFC and substantial evidence supports the RFC determination, the ALJ did not err.

E. The ALJ's failure in not assigning weight to the opinions of Plaintiff's treating physicians constitutes a harmless error.

Plaintiff argues that the ALJ erred by not stating the weight that he afforded to the opinions of Dr. Villar-Gosalez and Dr. Avery. (Pl.'s Mem. at 22-24.) Defendant responds that the ALJ adequately addressed both physicians' opinions. (Def.'s Mem. at 12-15.)

1. The ALJ erred in not assigning weight to the medical opinions.

During the sequential analysis, when the ALJ determines whether the claimant has a medically-determinable severe impairment, or combination of impairments which would significantly limit the claimant's physical or mental ability to do basic work activities, the ALJ must analyze the claimant's medical records that are provided and any medical evidence

resulting from consultative examinations or medical expert evaluation that have been ordered. 20 C.F.R. § 416.912(f). When the record contains a number of different medical opinions, including those from the claimant's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence. 20 C.F.R. § 416.927(c)(2). If, however, the medical opinions are inconsistent internally with each other or other evidence, the ALJ must evaluate the opinions and assign them respective weight to properly analyze the evidence involved. 20 C.F.R. §§ 404.1527(e)(2)(ii); 416.927(e)(2)(ii).

An ALJ is required to assign weight to every medical opinion in a claimant's record. 20 C.F.R. § 404.1527(c) ("Regardless of its source, we will evaluate every medical opinion we receive."); § 404.1527(c)(2) ("We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."). Determining the specific weight of medical opinions is especially important, because the regulations further require a comparative analysis of competing medical opinions. *See, e.g.*, 20 C.F.R. § 404.1527(c)(1) ("Generally, [the Commissioner] give[s] more weight to the opinion of a source who examined [plaintiff] than to the opinion of a source who has not examined [plaintiff].") Requiring an ALJ to assign specific weight to medical opinions is necessary, because a reviewing court "faces a difficult task in applying the substantial evidence test when the [Commissioner] has not considered all relevant evidence." *Arnold v. Sec'y of Health Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977).

Unless the Commissioner "has sufficiently explained the weight [s]he has given to obviously probative exhibits, to say that h[er] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine

whether the conclusions reached are rational." *Id.* (quoting *Oppenheim v. Finch*, 495 F.2d 396,

397 (4th Cir. 1974)) (internal quotation markers omitted). The assignment of weight needs to be

sufficiently specific "to make clear to any subsequent reviewers the weight the adjudicator gave

to the . . . source's medical opinion and the reasons for that weight." SSR 96-2p (discussing

affording weight to treating physicians). Accordingly, a reviewing court cannot determine if

substantial evidence supports an ALJ's findings "unless the [ALJ] explicitly indicates the weight

given to all the relevant evidence." *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984)

(citing *Myers v. Califano*, 611 F.2d 980, 983 (4th Cir. 1980); *Strawls v. Califano*, 596 F.2d 1209,

1213 (4th Cir. 1979); *Arnold*, 567 F.2d at 259)); *Vaughan v. Colvin*, 2014 WL 4700256, at *18

(E.D. Va Sept. 18, 2014) (finding error where the ALJ failed to assign specific weight to the state

agency physician's opinion, instead only stating that he had assigned it "appropriate weight.").

Here, the ALJ did not assign specific weight to the opinions of Dr. Villar-Gosalez and Dr.

Avery. He merely stated that he considered the opinions and that they were "not supported by

objective findings" in the record. (R. at 23). Accordingly, the ALJ erred. *See Stawls*, 596 F.2d

at 1213 (finding error where Secretary failed to indicate weight afforded to certain medial

opinions). However, any error resulting from a lack of specific weight was harmless for the

reasons that follow.

2.   The harmless error in Social Security cases.

A determination of harmless error in this case must begin with a discussion of the

application of the harmless error rule in a Social Security Disability case. In *Shineski v. Sanders*,

the Supreme Court held that the harmless error rule applies in both the civil and administrative

contexts. 556 U.S. 396, 407 (2009) (reviewing the denial of veterans' claims for disability

benefits). The Fourth Circuit has yet to directly apply *Sanders* to Social Security Disability cases

in a published opinion, but has applied the harmless error doctrine when reviewing Social

Security appeals in two unpublished opinions. *Garner v. Astrue*, 436 F. App'x 224, 225 n. * (4th

Cir. 2011) (unpublished) (finding that a drafting error constitutes harmless error because ALJ's

findings were clear); *Morgan v. Barnhart*, 142 F. App'x 716, 723 (4th Cir. 2005) (unpublished)

(finding error by the ALJ regarding time restrictions for sitting and standing to be harmless).

Furthermore, the Fourth Circuit recently indicated in a published opinion the potential for a

harmless error in Social Security cases. *See Mascio v. Colvin*, 780 F.3d 632, 639 (4th Cir. 2015)

("The ALJ's error would be harmless if he properly analyzed credibility elsewhere. But here, the

ALJ did not."). And, this Court has held that the harmless error rule applies to Social Security

cases. *James v. Colvin*, 2014 WL 4630598, at *15-16 (E.D. Va. Sept. 11, 2014).

Having determined that the harmless error rule applies, this Court must then decide

whether the error here was harmless. The burden establishing that the error was harmful rests on

the "the party attacking the agency's determination." *Sanders*, 556 U.S. at 409. As the Court in

*Sanders* elaborated:

> To say the that the claimant has the "burden" of showing that an error was
> harmful is not to impose a complex system of "burden shifting" rules or a
> particularly onerous requirement . . . Often the circumstances of the case will
> make clear to the appellate judge that the ruling, if erroneous, was harmful and
> nothing further need be said. But, if not, then the party seeking reversal normally
> must explain why the erroneous ruling caused harm.

*Id.* At 410. Thus, when reviewing a decision for harmless error, a court, among other things,

must look at:

> An estimation of the likelihood that the result would have been different, an
> awareness of what body . . . has the authority to reach the result, a consideration
> of the error's likely effects on the perceived fairness, integrity, or public
> reputation of judicial proceedings, and a hesitancy to generalize too broadly about
> particular kinds of errors when the specific factual circumstances in which the
> error arises may well make all the difference.

*Id.* at 411-12. And "where the circumstances of the case show a likelihood of prejudice, remand is appropriate so that the agency can decide whether consideration is necessary." *McLeod v. Astrue*, 640 F.3d 881, 888 (9th Cir. 2010). Against this standard, the Court concludes that the ALJ's error is harmless.

      3.   A prior ALJ assigned weight to Dr. Villar-Gosalez's opinion.

      The error in not assigning specific weight to Dr. Villar-Gosalez's opinion was harmless because a prior ALJ gave that same opinion no weight. Previously, on February 25, 2011, ALJ Brian P. Kilbane issued a decision finding that Plaintiff was "not disabled" and denying SSI. (R. at 81-89.) ALJ Kilbane gave "no weight to the assessment of Dr. Carlos Villar-[Gosalez] . . . dated May 18, 2010, as these opinions are unsupported by the underlying treatment records. Dr. Villar never stated why he believes the claimant has such extreme limitations." (R. at 88.) Clearly, ALJ Kilbane assigned specific weight to Dr. Villar-Gosalez's opinion at issue here.

      The ALJ in this case was bound to consider ALJ Kilbane's findings. An ALJ must consider as evidence the findings made in a final decision by an ALJ or the Appeals Council on a prior disability claim. *See Albright v. Commissioner of the Social Security Administration*, 174 F.3d 473, 477-478 (4th Cir. 1999) (applying the substantial evidence rule rather than preclusion to a prior ALJ's decision); AR 00-1(4), 2000 WL 43774. And, the ALJ must give it appropriate weight in the adjudication. AR 00-1(4), 2000 WL 43774. In determining the proper weight, the ALJ considers such factors as: (1) whether the fact is subject to change with the passage of time; (2) the likelihood of such a change; and (3) the extent that evidence not considered in the prior claim provides a basis for making a different finding in the subsequent claim. *Id.*

      Here, the ALJ considered the prior ALJ's assignment of weight given to a medical opinion rather than a particular finding. The passage of time could not change the particular

medical opinion or the weight afforded to it. The current ALJ could therefore rely on the prior ALJ's assignment of weight.

In fact, the ALJ gave "considerable weight to the prior decision of ALJ Kilbane" in determining Plaintiff's RFC. (R. at 23.) In doing so, the ALJ discussed *Albright* and the Acquiescence Ruling discussed above. (R. at 23.) The ALJ then noted that he considered Dr. Villar-Gosalez's opinion, but that it was dated before the prior ALJ decision. (R. at 23.) This makes it clear that he deferred to the prior ALJ's assignment of weight, though he did not explicitly assign his own. This deferral without explanation did not prejudice Plaintiff, because it does not prevent an effective review of the ALJ's decision. Therefore, any error that the ALJ made in not specifically assigning weight to Dr. Villar-Gosalez's medical opinion is harmless.

    4.  The ALJ clearly considered Dr. Avery's opinion despite not specifically assigning it weight.

The error with regard to the weight given Dr. Avery's opinion is likewise harmless as a result of the deference given to the prior ALJ's decision. Though Dr. Avery's opinion was not considered by the prior ALJ, his questionnaire was dated April 8, 2011, less than two months after the prior ALJ's February 25, 2011 decision. (R. at 891.)

The ALJ clearly considered Dr. Avery's opinion even if he did not explicitly assign it weight. He noted how close in time the opinion occurred after the prior ALJ decision and stated, "there is no evidence of, nor [does it] establish, worsening of any condition." (R. at 23.) Because the opinion did not indicate any worsening of Plaintiff's condition, it was merely cumulative of the evidence considered by the prior ALJ. The prior ALJ's decision would not have reasonably been different had the prior ALJ been able to consider Dr. Avery's opinion. With the considerable weight given to the prior ALJ's decision, this Court can infer that Dr. Avery's opinion was afforded little weight.

The ALJ also noted the limited scope and duration of Dr. Avery's treatment of Plaintiff. (R. at 23.) Finally, the ALJ stated that the objective findings in the medical evidence of record did not support Dr. Avery's opinion. (R. at 23.) These statements make clear that the ALJ considered Dr. Avery's opinion despite his failure to assign it a specific weight. Therefore, this Court is not prevented from determining whether substantial evidence supports the ALJ's findings. Because this Court can still effectively review the ALJ's decision, any error in not assigning a specific weight to Dr. Avery's opinion is harmless.

VI.    CONCLUSION

For the reasons set forth above, the Court recommends that Plaintiff's Motions for Summary Judgment or in the Alternative Motion for Remand (ECF Nos. 13, 14) be DENIED, that Defendant's Motion for Summary Judgment (ECF No. 16) be GRANTED and that the final decision of the Commissioner be AFFIRMED.

Let the clerk forward a copy of this Report and Recommendation to the Honorable James R. Spencer and to all counsel of record.

**NOTICE TO PARTIES**

**Failure to file written objections to the proposed findings, conclusions and recommendations of the Magistrate Judge contained in the foregoing report within fourteen (14) days after being served with a copy of this report may result in the waiver of any right to a <u>de novo</u> review of the determinations contained in the report and such failure**

shall bar you from attacking on appeal the findings and conclusions accepted and adopted

by the District Judge except upon grounds of plain error.

/s/
David J. Novak
United States Magistrate Judge

Richmond, Virginia
Date: August 28, 2015